(No. 4868 ▬▬▬▬▬▬▬

GEORGE CASSIDY SONS CO., An Illinois Corporation, Claimant, vs. STATE OF ILLINOIS, Respondent.

*Opinion filed December 20, 1963.*

THOMAS A. GRAHAM and PAUL V. MATON, Attorneys for Claimant.

GRENVILLE BEARDSLEY, Attorney General; LESTER SLOTT, Assistant Attorney General, for Respondent.

DOVE, J.

On April 27, 1959, George Cassidy Sons Company, An Illinois Corporation, filed a complaint seeking an award in the amount of $218,690.58 for damages, extra labor, and material costs incurred in the construction of a new dietary facility at the Kankakee State Hospital.

The complaint recites that the company was awarded contract No. 69662 on June 17, 1957, and that it immediately began construction according to the plans and specifications, which, among other things, provided that the work was to be completed in one year.

Before reciting the difficulties, which occurred on the job, two sections of the specifications should be set forth:

## ARTICLE 22

The owner, without invalidating the contract, may make changes by altering, adding to, or deducting from the work, the contract sum being adjusted accordingly. All such work shall be executed under the conditions of the original contract, except that any claim for extension of time caused thereby shall be adjusted at the time of ordering such change.

No change shall be made, unless in pursuance of a written order from the Supervising Architect, stating that the owner has authorized the change, and no claim for an addition to the contract sum shall be valid unless so ordered.

The value of any such change shall be determined in one or more of the following ways:

    (a)   By estimate and acceptance in a lump sum.

    (b)   By unit prices, named in the contract, or subsequently agreed on.

## ARTICLE 64

The General Contractor shall provide his own fuel, apparatus and heat as necessary for the thawing or heating of frozen ground and material, and, in the case of the latter, sufficient heat shall be maintained until material incorporated in construction has taken final set, and all danger of damage by frost is past. This shall in no case conflict with requirements of protection in Masonry Specifications.

Where available, all necessary steam for properly heating the building, or buildings, under construction will be furnished to the General Contractor at no cost, but the contractor shall pay for, and make all necessary arrangements with the Heating Contractor for all connections to and from the nearest available heating main and returns, and also for the furnishing and connecting of all temporary heating units sufficient to maintain an even temperature of at least 60 degrees in the building, or buildings, under construction. Heating period shall be as follows: Approximately October 1st to May 30th unless conditions warrant otherwise, then the final decision shall be made by the Supervising Architect's representative in the field.

The plans for this facility were prepared by Samuel A. Lichtmann, associate architect. Shortly after the commencement of the work, claimant noticed certain discrepancies in the plans and drawings. Claimant asked for information regarding a retaining wall, and the alternative bid to construct it, also specifications for slabs, column footings, floor gratings, extent of attic floor, foundation pilaster, glazed tile, and ceiling heights for the kitchen and dining room.

Soil borings were furnished by the State, which proved to be inaccurate, as the water table was higher than reported. As a result, the building was raised six inches, and claimant was directed to make the change. The work was delayed, because of differences of opinion with the associate architect as to the necessity of a retaining wall to keep out the water. Thereafter, the associate architect changed his mind, and ordered the retaining wall.

A series of delays thereafter occurred involving steel sash operations, reinforcing steel, color of tile and fabrication of aluminum entrances. The Division of Architecture finally directed claimant to disregard the selection by the associate architect, and it made the selection.

A dispute developed between the Division of Architecture and the associate architect as to the coursing of the masonry, and it was necessary for claimant to run his masonry out of line. As a result, the labor costs were greatly increased.

Final approval of the shop drawings for structural steel were not received until 4½ months after the job was started. During this time claimant had large crews of skilled laborers on hand, and he was obliged to pay "show-up" time in order to keep the men available.

In constructing the building according to the plans and specifications, there was a variance in roof heights, with no provision for closure between the two elevations. This prevented claimant from enclosing the building, so that it could use heat furnished by the State, as provided by Art. 64. As a result, claimant was obliged to furnish heaters and fuel oil to protect the then completed work.

Other prime contracts, which were an integral part of the contract, were not immediately awarded, nor correlated with claimant's work. It further appears that the

plans furnished such contractors were inadequate, or changed so, that, as a result, their inability to do the work caused additional delays to claimant.

Finally, claimant contends that he contracted to build the building in 365 days (June 17, 1957 to June, 1958), but, because of incomplete plans, disagreements between the Division of Architecture and Engineering and the associate architect, and changes of plans, he was delayed until March 31, 1959, a delay of 287 days.

Claimant is asking reimbursement from July 1, 1958 to December 31, 1958, and is not making claim for the period of January 2, 1959 to March 31, 1959.

Respondent's exhibit No. 1 is a copy of the Departmental Report, dated May 7, 1959. It recites in substance:

"1. During the progress of the work, revisions, corrections, alterations, and additional work were necessary to properly complete the project.

2. Claimant's complaint about lack of correlation with other prime contractors is true, and their delays delayed the claimant.

3. Inadequacies were found in the plans and specifications.

4. Claimant was ordered to make changes, and to delay work pending decisions on other matters.

5. Department is unable to check the figures quoted in claim, since day costs are not part of its duty. Therefore, it is impossible to estimate cost of additional compensation.

6. The Division of Architecture and Engineering has checked the estimated completion time, and has found that, under normal conditions, this project could have been completed within the allotted time."

Exhibit No. 3 is claimant's break-down of increased costs, and is the basis of the claim.

### INCREASED COSTS

| | | |
|---|---|---:|
| Superintendent | | $ 6,500.00 |
| Rental Equipment | | |
| Compressor | $ 1,950.00 | |
| End Loader | 6,825.00 | |
| Mortar Mixer | 1,170.00 | |
| Welder | 455.00 | |
| Trucks (2) | 4,800.00 | |
| Heaters (6) | 7,260.00 | |
| Generator | 910.00 | |

| | | |
|---|---|---|
| Crane | 10,400.00 | 33,770.00 |
| Additional Material (6" glazed tiles) | | 2,310.00 |
| Additional Insurance Premiums | | 2,090.00 |
| Additional Fuel Costs | | 16,835.62 |
| Additional Labor Costs | 114,893.58 | |
| Workmen's Compensation and Social Security | 13,775.22 | 128,668.80 |
| Supervision and Clerical | | 28,516.16 |
| TOTAL COSTS | | $218,690.58 |

Respondent's exhibits Nos. 3 and 4 consist of hundreds of pages, and contain copies of letters between the department and the associate architect; letters between claimant, the department, and associate architect; change orders; and summaries of joint conferences. The matters therein contained are too voluminous to set forth, but this much is clear, the plans of the associate architect were so inadequate that the department should not have let the contract at the time, and ordinary prudence on the part of claimant should have advised it that this job was headed for trouble.

The notes on the joint conference, held on March 14, 1958, with reference to extras, delays, responsibilities, and procedure, illustrate the problem.

"Twelve ventilating diffusers were in error on the drawing. This held up the construction of the ceiling, lathing and plastering. The associate architect assumes part of the responsibility, as they were prepared by his associate mechanical engineer.

"In another matter, the associate architect complained that he was being by-passed by the department. The associate architect stated that the selection of paint colors and ceramic tile was an architectural function, but the department insisted that it would make its own selections."

There are many more items covered in the agenda, but the above illustration points out that there was serious bickering between the architects, and much delay was occasioned, because of their inability to agree. Claimant had to stand by while these differences were resolved.

At a hearing held on May 13, 1959, Mr. James N. Gaunt, Chief of Construction for the Division of Architecture and Engineering, was called as a witness by claim-

ant. He testified that he was acquainted with this job, as he had visited the site during construction. He stated that he was present at all of the meetings when many of the difficulties were discussed, and changes were made.

He stated that the associate architect prepares the plans and specifications; he determines the work to be done and type of material used. Unfortunately in this case the mechanical, electrical and general plans were not of such a nature that they could immediately be combined. In several cases, we (the department) had to make decisions that were normally his (the associate's) responsibility, because of his inability or indecision to do so.

Mr. Gaunt concluded his testimony by stating that the department did not keep day records, which would enable it to estimate the additional compensation due claimant, but he did state they were entitled to additional compensation.

It appears, therefore, from the testimony, records, and Departmental Report, that claimant performed this contract under the direction of the Department of Architecture and Engineering; that additional costs were incurred by reason of delays and changes; and, that claimant is entitled to additional compensation upon due proof of damages.

Returning to claimant's exhibit No. 3, the first item is salary of Superintendent, $6,500.00. At page 12 of the transcript, Mr. Leo Cassidy testified that he charged the job for 26 weeks at $250.00 per week, which was the Supervisor's full salary, and further stated that he was also running other jobs.

Copies of the payroll time sheets disclose that claimant had two contracts at the Manteno State Hospital in progress at the same time. It may be presumed that the

supervisor was also being charged to these jobs, and, therefore, the Kankakee State contract should not carry the whole load. Item 1 is, therefore, reduced to $2,166.66.

Item 2 is a claim for rental of equipment in the amount of $33,770.00. Claimant contends that their equipment was tied up from July 1, 1958 to December 31, 1958, and that, due to the unwarranted delay, it was not available for other jobs. If, in fact, claimant had to rent equipment for other jobs, its position would be tenable, but the proofs do not support this claim. At page 59 of the transcript, Robert Cassidy was asked:

"Q. Were you required to rent other equipment?
A. In some cases we had to rent other equipment."

There is no proof in the record to show that claimant was "out of pocket", because the equipment was at the Kankakee State Hospital from July 1, 1958 to December 31, 1958. Much of this equipment could be transported back and forth from the Manteno job, as the distance is only 12 miles. Since the claimant has failed to show any pecuniary loss, no award will be made for equipment rental.

Item 3 is a claim for additional material, glazed tile, in a total amount of $12,310.00. Upon cross-examination of Robert Cassidy, it appears that claimant included, or should have included, 2 x 4 glazed tile in its original bid, and the fact that 6 inch glazed tile was used is not material. The witness concluded that the State was entitled to a credit of $2,310.00. In effect, claimant has acknowledged an error, and, therefore, Item 3 for glazed tile will not be allowed.

Item 4 is a claim for additional insurance premium in the amount of $2,090.00. At page 24 of the testimony, it appears that the invoice for insurance amounted to $759.70, rather than $2,090.00. No explanation was given

to account for the error. Therefore, the claim will be reduced to $759.70.

Item 5 is a claim for fuel costs in the amount of $16,-835.62, and of this cost, $12,483.00 is for fuel oil. Article 64, heretofore set forth, is ambiguous. Paragraph one requires the contractor to furnish fuel and apparatus at his own cost. Paragraph 2 states that, where available, all necessary steam will be furnished at no cost to the contractor. Claimant contends that, had he been able to finish the work according to schedule, he would have been under roof and used steam. He further stated that he bid the job on the basis of using State steam; otherwise, he would have included a charge for heat.

Page 8 of exhibit No. 3 purports to be an hourly break-down of fuel costs from July 1, 1958 to December 31, 1958. These figures do not jibe with reality. There would be no fuel oil needed for July, August and September, and to charge 3,612 hours of fuel for October, November and December is incredible.

The exhibit states that the crane used 1,040 hours of gasoline. 1,040 hours equals 130 eight-hour working days, and there were only 130 working days from July 1, 1958 to December 31, 1958. A crane is a special piece of equipment, and this Court is not prepared to believe that the crane was used eight hours a day for the 130 working days from July 1, 1958 to December 31, 1958.

In analyzing this page, it would seem that the total fuel costs would cover the entire building period. The first 12 months must be charged to the original contract, while the next six months could be attributed to the delay. In the absence of better proof in this regard, the Court will assume that one-third of the total bill is a fair adjustment, and this item will, therefore, be reduced from $16,835.62 to $5,611.87.

Item 6 consists of a claim for additional labor in the amount of $128,668.80.

The testimony relates that, due to absence, inconsistency or change in plans, masonry walls were erected, torn down, and later reconstructed. Laborers would show up for work, and thereafter be released for the day, and claimant would be obliged to pay for four hours of "show-up" time.

Page 7 of exhibit No. 3 indicates the actual hours of labor performed by each trade. Claimant then includes an estimated number of hours, which should have been the hours required, had the job been completed on time. For example:

MASONS

| Actual Hours | Estimated Hours | Difference | Rate | Total |
|---|---|---|---|---|
| 13,570.5 | 6,880 | 6,690.5 | $3.60 | $24,085.80 |

From the above, it would appear that labor for masonry was almost twice the estimated price. A difficulty facing this Court is the use of claimant's figures as proof of damages. The figure of 6,880 estimated hours for masonry could be entirely self-serving.

The Attorney General did not question the figure, or offer any proofs to the contrary, and did not object to the exhibit being offered into evidence. The only corroboration as to their validity is found in the testimony of James N. Gaunt at page 81:

"Q. As long as you have never seen them (payroll record), would you have any idea whether or not their payroll records are correct?

A. I would not hazard a guess on that. Their payroll records are, in all probability, on file in a couple of departments of the State. I do not think they would dare offer them as evidence if they were not correct. The Department of Labor bases Workmen's Compensation payments on the basis of their records."

Pages 2, 3 and 4 of exhibit No. 3 are a break-down of all labor costs from the beginning of the job on June 12, 1957 to December 31, 1958.

The payroll records support the claim from July 3, 1958 to September 10, 1958, but there are no payroll records from September 10 to December 31, 1958. From the claim, the following must be disallowed:

| | | | |
|---|---|---|---|
| Masons | 133 hours @ $3.60 | $ | 478.80 |
| Iron Workers | 165 hours @ 3.475 | | 573.38 |
| Carpenters | 409 hours @ 3.20 | | 1,308.80 |
| Laborers | 112 hours @ 2.45 | | 274.40 . |

$2,635.38

We are of the opinion that the claim for additional labor costs is excessive, and are, therefore, arbitrarily reducing it by an additional 15%. The labor claim is, therefore, reduced from $114,893.58 to $95,419.47.

The claim for workmen's compensation, public liability and social security is based on 12% of the payroll records on the reduced amount. This would amount to $11,466.74. As to the proofs under this item. Mr. Robert Cassidy at page 65 of the transcript testified, "We took what we considered a normal percentage in the industry, which was 12% for the total labor cost."

This statement hardly qualifies as proof, as social security charges during 1958 were 2¼% of payroll, and workmen's compensation charges ranged from 1.74 to 4.45, depending upon the trade and job conditions. Since the burden of proof is upon claimant, and there is inadequate proof, this Court will arbitrarily limit recovery to 6% of the payroll. This would amount to $5,725.17.

Item 8 of the claim relates to supervision and clerical in the amount of $28,516.16, and is based on a charge of 15% of all the items listed, except the claim for Superintendent. 15% of the revised amounts, $109,682.87, would total $16,452.43. This claim, at a rate of 15% for the extras involved, is in keeping with the usual charges of the industry, and is proper.

Page 1 of exhibit No. 3, heretofore referred to, would appear as follows with the deletions noted:

| | | Amount Asked | Amount Allowed |
|---|---|---|---|
| 1. | Superintendent | $ 6,500.00 | $ 2,166.66 |
| 2. | Rental of Equipment | 33,700.00 | None |
| 3. | Additional Material | 2,310.00 | None |
| 4. | Additional Insurance Premiums | 2,090.00 | 759.70 |
| 5. | Additional Fuel | 16,835.62 | 5,611.87 |
| 6. | Additional Labor | 114,893.58 | 95,419.47 |
| 7. | Workmen's Compensation and Social Security | 13,775.22 | 5,725.17 |
| | SUB-TOTAL | | $109,682.87 |
| 8. | Supervisor and Clerical | | 16,452.43 |
| | TOTAL | | $126,135.30 |

Respondent, in its brief, does not deny the essential allegations of the claim, but contends that Article IV, Section 19, of the Constitution:

"The General Assembly shall never grant or authorize extra compensation, fee or allowances to any public officer, agent, servant or contractor, after service has been rendered or a contract made, nor authorize the payment of any claim or part thereof, hereafter created against the State under any agreement or contract made without express authority of law; and all such unauthorized agreements or contracts shall be null and void; PROVIDED, the General Assembly may make appropriations for expenditures incurred in suppressing insurrection or repelling invasion."

prohibits the General Assembly from making any appropriations to pay the claim, and cites *Fergus* vs. *Brady*, 277 Ill. 272. J. B. Fergus filed a bill seeking an injunction against the Auditor and Treasurer of the State from paying various sums appropriated by the General Assembly to certain boards and individuals. The bill alleged that appropriations amounting to more than $400,000.00 were illegal, because they were in excess of the revenue authorized to be raised by taxation. Demurrers and special demurrers were filed, and the case was thereafter decided as a matter of law.

The court construed Sec. 18, which is not germane to our case, and with reference to Sec. 19 at page 279, the court stated:

"In Sec. 19, claims under any agreement or contract made by express authority of law are excepted, and, if there is some particular and specific thing, which an officer, board or agency of the State is required to do, the performance of the duty is expressly authorized by law."

The court then affirmed the trial court, and held there was no express authority of law to authorize the payments.

A recent case decided by this Court, *George E. Beardsley* vs. *State of Illinois,* No. 5048, is a perfect example of the application of Sec. 19. In 1961 the General Assembly passed a statute creating the Illinois Industrial Authority. George E. Beardsley was employed as General Manager at a salary of $12,000 per year, and he thereafter set up an office, and engaged clerical help. He was paid his salary and expenses until March 23, 1962, when the Supreme Court found the statute was unconstitutional. The Auditor and Treasurer then refused to issue warrants for unpaid bills, and a claim was filed in the Court of Claims.

This Court held that a statute, found unconstitutional under Sec. 19 of Art. IV of the Constitution, would prevent this Court from making an award, as it would constitute a payment *without express authority of law.*

The test in this case, therefore, is to determine whether or not there is express authority of law, which would authorize the Department of Public Welfare to enter into this contract, to create additional charges for extras, and be accountable for undue delays.

The largest Code Department of the State of Illinois is the Department of Public Welfare. It employs more than 13,500 persons. It operates 26 institutions, containing more than 10,000 acres, and has under its

control 1,430 buildings. It feeds, houses and cares for many thousands of people, and, while the amount of the appropriation does not apear in evidence, it is common knowledge that it amounts to many millions of dollars.

It is also common knowledge that the State is constantly expanding the services of the department by authorizing the construction of new clinics and hospital facilities. Due to the complexity of its operations, it is undoubtedly true that contracts cannot be completed within the biennium, and, as a result, vast sums of appropriated money do lapse.

With this background, it is apparent that the department is authorized by law to expend large sums of money for the ever increasing demands of the State.

Attention is directed to Article 22 of the plans and specifications, wherein the State, as owner, reserves the right to alter, add, or deduct work from the contract, and it agrees to pay by estimate and acceptance of a lump sum or by unit price. This is a standard provision in building contracts, whether the builder be the State or an individual as a practical matter. There is no alternative to the provision, as the State must reserve the right to make changes or add to the work, and it must be assumed that the department will act in good faith, and complete a structure for its best intended use.

The Court, therefore, finds that this contract, with its provisions for changes and alterations, was authorized by law.

This Court has held that, where a contractor has been prevented by the State from completing his contract due to delays, changes in plans, and increased costs, an award will be made.

*Blauner Construction Co., An Illinois Corporation,* vs. *State of Illinois,* 22 C.C.R. 538

*Divane Brothers Electric Company, A Corporation,* vs. *State of Illinois,* 22 C.C.R. 546

*Hyre Electric Co., An Illinois Corporation,* vs. *State of Illinois,* 22 C.C.R. 554

This Court has also held in previous cases that, if funds were available under an appropriation, which could have been used to pay authorized bills, and would have been used, if, in fact, the fund had not lapsed, an award will be made.

*M. J. Holleran, Inc.,* vs. *State of Illinois,* 23 C.C.R. 17

*Standard Oil Co., Indiana, Inc., A Corporation,* vs. *State of Illinois,* 23 C.C.R. 72

*Sankey Bros., Inc., A Corporation,* vs. *State of Illinois,* 23 C.C.R. 223

From the Departmental Report, it is apparent that, if the contract had been completed within the biennium, the department would have determined an amount, which it believed was fair and proper, and paid claimant, but, since the appropriation had lapsed, claimant has been obliged to seek redress in the Court of Claims.

The Court, therefore, finds that claimant, George Cassidy Sons Company, A Corporation, is entitled to an award in the amount of $126,135.30.